(36 Misc. Rep. 98.)

## SZOTAK v. BERWIND-WHITE COAL MIN. CO.

(City Court of New York, General Term.   October, 1901.)

INJURY TO EMPLOYE—NEGLIGENCE OF FELLOW SERVANTS.

Where a coal miner in Pennsylvania, acquainted with the perils of crossing a mine's haulage way in which coal cars were run, was injured by a car while necessarily crossing such way, the fact that he had previously notified his mining foreman, made by the law in Pennsylvania and the decisions of its courts his fellow servant, of the defects which contributed to his injury, and knew that such defects had not been remedied by such foreman, precluded him from recovering for injuries as for a neglect of his employer to furnish him with a safe place to work in.

Appeal from trial term.

Action by Joseph Szotak against the Berwind-White Coal Mining Company.   From a judgment on a verdict for plaintiff, and from an order denying a new trial, defendant appeals.   Reversed.

Argued before CONLAN, O'DWYER, and HASCALL, JJ.

Wilcox, Adams & Green (David L. Krebs and George Bethune Adams, of counsel), for appellant.

Jones & Nekarda (F. W. Catlin, of counsel), for respondent.

HASCALL, J.   The action was brought to recover damages for personal injuries alleged to have been caused by negligence in permitting to exist an unsafe and dangerous exit from a coal mine owned and operated by defendant in Dunlo, Pa.   In this mine plaintiff labored, and was in daily use of the passage in question.   Entrance to the mine was by means of a cage, operated in a shaft leading into a slope, or haulage way.   This slope was principally used for the purpose of transporting coal out of the mine by means of railroad cars, upon a single track, hauled and controlled by a cable operated by an engineer in charge of a steam engine located near the entrance to the mine.   Corridors or headings ran from this slope in various parts where the coal was dug.   In these headings, other cars, for carrying out the excavated coal, were hauled by mules from and to the slope, where they were attached to the cable.   In consequence of the operation of a railroad in this slope, it was considered a dangerous place, and it was commanded by law that a traveling or man way should be provided by the operator of the mine, and that persons employed as miners should "not travel to and from their work except by the traveling way assigned for that purpose."   Act Pa. May 15, 1893, art. 20, rule 71 (P. L. 86).   A proper manway had been provided by defendant, which followed the general direction of the slope and railway, and some feet away from it, on the opposite side from the entrance to the heading, mentioned in the testimony, where plaintiff worked.   This manway was used by miners who were walking to and from performance of their daily tasks.   The plaintiff alleges that he was leaving his place of work, March 9, 1900, at the close of day; was proceeding through the heading, in the direction of the slope; had reached the point of intersection of the heading with the slope, going towards the exit of the mine; and, while in the act of carefully stepping on the tracks in the slope,

was unexpectedly and without any warning run upon, struck, and knocked down by a train of descending cars, and sustained severe and permanent injuries; that immediately before he so stepped upon the track in the slope his foot became, through no fault on his part, caught and fastened in an insecure and dangerous place, by the side of the track, obstructed by a steam pipe laid near by, which was defective, and out of repair. For further specification of acts of negligence on defendant's part, plaintiff charges, in rather vague averment, that this "defective pipe permitted steam to escape and obscure the view of persons going out of the mine; that it was negligently and carelessly allowed to remain there for a long time prior to the day of the accident, with the result that, before plaintiff could extricate his foot, his collision with the cars occurred; that the train was proceeding on a downgrade; that defendant had negligently omitted to furnish brakes, or other proper facilities, for stopping or controlling the cars, and furnishing to employés an unsafe and dangerous exit." The defendant denies its carelessness; alleges contributory negligence by plaintiff, or fault of a fellow servant; asserts the operation of its mine under general laws and statutory rules, conformity therewith, and freedom from liability. No direct personal negligence is alleged against the owner; only a resulting liability because of omissions on the part of its superintendent, its direct representative. We have to consider whether the allegations are sustained against one duly charged in place of the owner, whether there was carelessness or improper conduct on the part of a co-workman, whether or not there was contributory negligence on plaintiff's part.

In his testimony plaintiff declares that he entered the mine, in the morning, by way of the cage, and walked down, not the manway, but the slope, about 150 yards, until he reached the heading where he was going to work; that there was a pipe, passing the heading, leading down from the cage along the slope, used to convey steam to pumps at a lower point in the mine; that, thus going to his work, this steam pipe was on his right hand, and, coming from his work, on his left; that he came down safely in the morning; that he had to pass this pipe in order to get out from the heading into the slope, and he went down and out the same way he went in, in the morning; that he had a light in his cap; that he was about crossing the tracks in the slope, to get into the manway, when the car struck him. With regard to his own vigilance and freedom from negligence, the plaintiff said that he looked and listened before going on the track; that steam from the alleged defective pipe, and noise it made in escaping, prevented him from seeing or hearing the cars as they came towards him; that he knew at what time the cars would pass; that he saw the steam, yet he kept right on; that these defects he had, some days before, brought to the attention of Mr. Griffiths, the mine foreman; that the hole, in which he says he caught his foot, was made partly by water and partly by the feet of the mules that drew the cars; ("the mules' feet had worn holes along between the ties"); that about a week before the accident he saw two or three holes at the same place; that he called the attention of the foreman

to them, and said, "I can't work there"; that again, two days before the accident, he called attention to them, and the foreman promised to fix them "right away"; that he had called attention to the hole in the pipe and escaping steam a week before the accident, and again two days before; that he was proceeding out of the heading in which he worked at 5 o'clock p. m.; that the place was lighted only by the lamp on his cap; that when struck his cap was on his head; that he was made unconscious, and hence did not know whether he was knocked, or was carried up the slope, on the left side, over 20 feet away from where he alleges he had been struck, and where he was found; that it was the custom of the employés, against orders, to walk on the ties in the slope, and the foreman himself had walked that way; that at the time of the accident the darkness of the mine and the escaping steam concealed the hole from view; that he knew it, yet went on; that he had worked in the mine 18 months before he was hurt; that the foreman, who employed him, was in the mine about three times a week, going around from one place to another and inspecting. He did not claim that his foot got caught by reason of the steam pipe, but was allowed, contravening his sworn allegation of particulars and over objection, to say that he got fastened in a hole between the ties of the track leading to the slope, made by mules tramping in water between the rails, while his complaint alleged that "while in the act of carefully stepping on the tracks in the slope" he was struck. It was shown by others that this steam pipe ran along the slope tracks, but was underground where the plaintiff said his foot got fast; that mules only went over the place described by him, in the heading, once in every 10 hours; that there was no water there, and (by three witnesses) that there was no hole there, and the track was in good repair; that the only noise from the pipe was a slight one, incident to the steam itself passing on through it; that an expansion joint, from which the steam was alleged to escape, was up the slope 30 to 36 feet from the heading; that a return of ventilation air to the shaft was ascending the slope at the rate of 500 feet per minute, and this would have carried any escaping steam away from the plaintiff, preventing obstruction of his view and of the place of crossing to the manway; that noise of steam, even if escaping, could not have drowned the noise of the cars; that a trackman, who was at the intersection of the heading and the slope, saw the plaintiff coming through the heading towards the slope, about 60 feet away, and heard the cars start, 500 feet away; that plaintiff was picked up on the left-hand side of the slope, the other side from that on which he claims he was standing when struck, and several yards above the heading; that he was struck on his face and nose; that he was found immediately, lying on the left-hand side of and up the slope, partly under the hind car; that from blood and flesh found on the brake handle of the car, he was probably struck by it; that this handle was on the left side of the forward car; that when found he was wet from having been in the small ditch on the left-hand side of the slope; that his cap was found, after the accident, some 24 feet up the slope, on the left-hand side.

Assuming the truth of his testimony, plaintiff knew in the morning, when he passed into the heading, whether or not there were any defects existing, or dangers or inconveniences, even, to be avoided; and that, if he walked on the ties in the slope, except to cross to and from the manway, it was a careless, improper, and unlawful act, and he took the risk. But this hole, plaintiff says, was made by mules. Therefore it was not on the slope, but, if existing, must have been in the heading, where the mules walked. The light—the ordinary lamp on plaintiff's cap—furnished the means for seeing the dangerous as well as the safe places. He said that when he was struck the cap was on his head, and it is fair to urge that where the cap was found the blow was struck, while being hit on the face and nose would indicate that he was going up the track, not across it. He said the blow made him unconscious; hence he does not know whether he was knocked or crawled up to where he was found, on the left side of the slope, over 20 feet above the heading. Mr. Griffiths, foreman and acting superintendent, called as a witness for the plaintiff (and who was neither contradicted, nor was attempt made to do so, nor in any way to show that he might be mistaken), testified that neither plaintiff nor any one else gave him notice of any defect at the place where plaintiff claims that the offending holes existed; that he (Griffiths) was filling the position of acting superintendent in addition to the duties of his regular position, which was mine foreman; that there was a superintendent above him and an assistant foreman below him in authority. The foreman also says he did not see the place of the accident on March 9th, but claimed that his attention had not been directed to any holes, and asserted that he made an examination just before and repeated it just after that date, and found all in good order. The plaintiff's testimony with respect to the report to Griffiths is without corroboration, is denied in the words that he "never was informed of any defects," and several witnesses declared that there was no foundation in fact for the plaintiff's claim as to the existence of the holes. The foreman also shows that there was no water in any hole about the vicinity, and that its presence in such a place, in the condition that plaintiff claims, would have been an infraction of the mining act (article 9).

The case is governed by the Pennsylvania law, and the mine foreman was a fellow servant with the plaintiff. The statute makes it clear that it was the duty of the foreman to make any necessary repairs in the mine (Voshefskey v. Iron Co., 21 App. Div. 168, 47 N. Y. Supp. 386), and establishes the relation in which Griffiths stood to the plaintiff; but at the same time, there being no local superintendent, Griffiths had devolved upon him performance also of the duties of superintendent. Article 8, § 2. Admittedly, the negligent acts or omissions of the foreman do not bind the owner, and to this foreman the miner must report unsafe conditions (article 20, rule 43, and article 7, § 1, last clause); and "if necessary supplies are not procured he [superintendent] shall notify the foreman, whose duty it shall be to withdraw the men from the mine," etc. The manway and slope were especially placed in care of the foreman (article 6, § 1), who was in absolute control underground, even against the owner

itself, and the law compelled it to employ him for that purpose. The superintendent had no power inside the mine. He furnished supplies. His office was outside the mine. The act says "superintendent" means a person who shall have, on behalf of the operator, immediate supervision of one or more mines, so that, with regard to the character of Griffiths' employment, he was the regular mine foreman, but with the duties of superintendent in addition devolved upon him pro tempore, while there was no other superintendent. If the plaintiff designate him as "superintendent" because of temporary duty, then defendant can with greater force designate him "mining foreman," the official title and office to which he was duly certified by state authority. By calling the mine foreman a superintendent, the plaintiff could not change his condition as fellow employé. He was not devested of his duly-certified capacity, title, and function; and, while we may not thus conclude that he was not also acting superintendent, and perhaps capable of receiving from himself, as foreman, notice of need of repairs in the mine, yet he was still the mine foreman. As matter of fact, it was not the place nor the duty of the miner to notify the superintendent, but the foreman. The former was to furnish supplies (article 7), the latter to use them and attend to affairs underground, immediately with and close to the workman, whose fellow and protector, interceder and mate, he was, placed there by reason of the law, without necessity for nor duty of manual labor (article 20), but only to watch over the miner as he worked in the many dangers incident to the occupation. The mine foreman is a state official, duly certified, after having passed a prescribed examination before a state board of examiners. Article 15, § 2. He must be of good moral character and temperate habits, and is a fellow employé. Honor v. Albrighton, 93 Pa. 475; Velas v. Coal Co., 197 Pa. 380, 47 Atl. 360. It was, then, the duty of plaintiff to make his complaint to the mine foreman, and not to the superintendent. Neither the owner nor the superintendent could interfere in any way with the foreman in the performance of his duties under the act, which explicitly placed in his care all traveling and haulage ways, and required him to remove or guard against any danger existing there. Plaintiff asserts that he called attention of the foreman to the place where the mules had worn the holes, and said, "I can't work there." But that was not his working place. He was not required nor expected to work there, but a long way further on up in the heading. His many inconsistent statements upon the stand were quite contrary to or outside the allegations of the complaint, to which he should have been confined in giving his testimony; but, even taking them all as true, it is evident that his foot did not get caught, as averred, in an insecure and dangerous place by the side of the track, obstructed by a steam pipe, chargeable to a superintendent's official indifference. This being so, the allegation of the complaint is false. Plaintiff knew the presence of the holes, made by the mules, for days before the accident, and they were in the track leading to the slope.

Some duty was imposed upon the defendant, if notice of defect were made; but the whole effect thereof, under the law, would be

that its superintendent must direct the mine foreman to make the repairs, and supply him with proper materials to do so, in failure of which duty the mine foreman must withdraw the men from the mine, if danger existed. It is argued that, the superintendent and foreman being the same person, plaintiff can call him by either appellation he chooses, and pro hac vice change the office of the man as he may wish. As to the superintendent, article 7 provides: "If from any cause he cannot procure the necessary supplies or material as aforesaid he shall notify the mine foreman, whose duty it shall be to withdraw the men from the mine, or part of the mine, until such supplies or materials are received." Then, if either, it was the foreman who was negligent, as neither owner nor superintendent could interfere in any way with performance of his duty. Durkin v. Coal Co., 171 Pa. 193, 200, 33 Atl. 237, 29 L. R. A. 808, 50 Am. St. Rep. 801. The legislature intended that the mine foreman should have exclusive charge of the inside workings of the mine, and it was immaterial that the plaintiff's notice was made to the superintendent, the same man. A different question might arise if complaint had been made to a distinct person as superintendent, or directly to the owner or operator, and it also appeared that the foreman was not notified. But here, where notice actually reached the foreman, whose legal duty it was to make repairs, and he, a fellow servant, neglected to make them, there would seem to be no liability on the part of the operator. The failure to remove even the approximate cause of the accident was the neglect of plaintiff's fellow, and not that of the master. Di Vito v. Crage, 165 N. Y. 378, 59 N. E. 141, and other cases, both in New York and Pennsylvania.

But we think that we do not require the alternative of negligence of a fellow workman as foundation for the decision that ensues, since the case made by plaintiff carries abundant evidence of contributory negligence when accepting his statements in the most favorable way towards himself. If, as he says, while coming out from the heading, he saw and heard the steam escaping, which concealed the presence of the holes and the approaching train, it was in itself a voice warning of danger, of which he was already partly sensible, and he should have heeded it, and stopped. Yet he "kept right on." In the absence of proof to the contrary, it is a legal presumption that the mine foreman did his duty, and he declares that he did. But plaintiff charges that he was negligent in making repairs. If this were true, yet plaintiff did not cease working, as it was his right and duty to do, if there were danger to be apprehended (rule 13, art. 20), nor refuse to enter the heading, but went on; and, although he claims the existence of a dangerous place that had been known to him for a week or more, and which he was passing by or across twice every day, yet he did not attempt to avoid it. By coming, immediately after the accident, to the state of New York to bring his suit (led to suppose, perhaps, that our laws were more favorable to his cause), he did not gain immunity from operation of the Pennsylvania statute in determining the question of carelessness or contributory negligence, nor did he waive benefits springing thereunder; and, if the way were unsafe, across which he must go, night and morning, from the manway to the head-

ing, he could, under the statute, lawfully have refused to continue work until repairs were made. It was not a case of a sudden creation of danger after he had last crossed, but a continuing condition of defect, of which he was well aware. Some recent decisions are interesting upon this occupying topic: "Where the servant was aware of the perils and appearance of the hole existing in the bed of the road, he knew and took the risks." Construction Co. v. Howell, 90 Ill. App. 122. "It is not the owner's duty to notify the servant of a danger equally obvious to all; and the negligence, if any existed, as claimed by the plaintiff, aside from his own lack of care, it must be held was that of a coservant, for which the master is not responsible." Maltbie v. Belden, 167 N. Y. 307, 60 N. E. 645. "Where, after a promise to repair made by the owner, or after a partial or imperfect repair known to the plaintiff, he voluntarily continued in employment, and was injured, it was held that the employer was not liable." Poindexter Case, 84 Mo. App. 352. Taking his testimony with the full force that can be generously accorded it, the fact is that his safely passing the alleged place of danger twice each day for a week before his accident certainly gave him, even through the most casual observation, knowledge whether the repairs, which he claims were needed, and which he insists he notified the foreman were needed, had or had not been made. The danger, known by plaintiff, should have been perceived when coming from the heading, if exercising a minimum of care. It was patent and threatening. He took the risk, which a prudent man would not have taken, if the danger were as great as he claims. Harriman v. Star Co., 81 Mo. App. 124. We think, also, weighing all the testimony plaintiff gives on the subject, that the noise of steam could not have drowned the noise of the cars; and the fact that plaintiff knew the hour, almost to the minute, when the train would pass the heading, is a circumstance to be considered upon the question of his hearing, or obligation to listen for, its approach.

The theory of plaintiff's case set forth in his complaint is not at all borne out by the facts shown in his testimony. He was picked up on the left-hand side of the slope; that is, the other side from which he claimed his foot was caught when he was struck. He said he was struck on his face and nose while leaning forward. It was thus impossible for him to have been thrown on the left side of the slope. But there he was found, his cap with him, some 24 feet up the slope, and partly under the hind car. Is it improbable, as appellant insists, that he started to walk out of the mine, after leaving his heading, the same way as he had walked into it, namely, on the forbidden track of the slope? If he were hit by the right-hand side of the forward car, as he claims, he does not account for remnants of his flesh finding their way to the brake handle on the left side, nor how it was that water from the ditch on the left-hand side of the slope made wet his clothing when he was found. As to his theory of possibly having crawled, after the blow, to the left, and under the car, this is an absurdity, in view of his direct testimony appearing further along. He says:

"When I got down to the mouth of the first right heading, I did not look out, because my feet stepped into the hole. When I got to the heading, I

looked to see if there were any cars coming, for it was time. I left my heading, and by that time I was struck. My right foot stepped in a hole, and with the force which I wanted to take out my foot the cars ran down and struck me. I made efforts to extricate my foot, and by that time they struck me with the cars. My foot was not in the hole a long time—I cannot tell—until I count five or six. I did not stop before I was struck, because I did not know if I was at the end of the heading or not. I did not see this steam pipe then, but the steam. I first saw this hole I got my foot into about a week before I was hurt. The next day when I went up there I did not see that hole again. I did not take much notice. I did not see it the day before I was hurt. Maybe I overstepped it. I ·did not take notice. It was between the ties. I knew that the mules were used on that heading that I was working in, since I was working there eighteen months or more. That hole was the same length as the ties were. It was between the ties and between the rails that day. In this heading there were men whose business it was to keep the track clean and keep it in good order. When I came down to within fifteen feet of the mouth of this heading, I came down to the steam. I did not stop a little bit. I stepped it. Then I had my light on my head. I could see the steam. Then I went right on. I did not stop again before I got on the slope, because I don't know that that is the end of the heading, only by this time when my foot was caught. I listened to see if any cars were coming, but I did not hear it. I did not see it. When the car hit me it knocked my cap off. I don't know about nothing more only when I was struck. * * * When the car hit me I was in the middle of the tracks on the heading. I just stepped out from the heading to the slope. I was not on the slope. * * * When my foot got fast, I stopped a little bit (illustrating), and the car jumped. This hole is one step from the side of the railroad track in the slope. The roadbed consisted of small coal. * * * I don't know whether that train made any noise. It may be they made a noise, but I did not hear it, because the steam noise was there."

Plaintiff's testimony with respect to the defects and the report thereof is flatly denied by Griffiths, his own witness, and by witnesses for defendant. It is claimed that, for lack of corroboration, the plaintiff has not sustained the burden of proof, and cannot recover; that it is the oath of one party against another, defendant not being impeached. Stevens v. Trask (Com. Pl.) 18 N. Y. Supp. 117, 118; Griffiths v. Hardenbergh, 41 N. Y. 464, 471. We shall, however, pass over this point to less technical grounds for appeal. But, suppose plaintiff were free from negligence, is there shown any material negligence of his fellow servant? "All employés shall inform the mine foreman, or his assistant, of the unsafe condition of any working place, hauling roads or traveling ways." Rule 43, art. 20. Plaintiff claims that he notified the foreman a week prior to the accident, and again two days before, of the existence of a defective steam pipe, and also of the hole made by the mules' feet. It was the duty of the foreman to make necessary repairs; but, if the neglect to make them continued dangerous conditions, it was also the privilege and duty of the plaintiff to stop working. This he did not do, but continued in the risk that he says existed, and clearly shows failure to repair by the foreman, and his own undoubted fault.

There is no attempt at evidence in the case to sustain the allegations of the complaint that the "defendant had negligently omitted to furnish with brakes or other proper facilities for stopping or controlling the same [cars], thus furnishing to its employés an unsafe and dangerous exit at said point." Under objection; however, plaintiff was allowed to show a state of alleged facts entirely incompetent.

and immaterial under his pleading. See Advance Sheets Am. Dig. No. 162, p. 494, April, 1901; Lally v. Lumber Co. (Minn.) 85 N. W. 157; Poindexter v. Paper Co. (1900) 84 Mo. App. 565.

As to the exceptions taken by the defendant upon the trial, we think many of them well founded, and, without other good grounds for our decision, we should feel obliged to pass upon them favorable to the appellant. But the case abounding with sufficient proof, under the alternative proposition of contributory negligence of plaintiff himself or fault of a fellow servant, there is no necessity for pursuing inquiry concerning exceptions taken below, other than the one enabling review of the facts. Judgment and order appealed from should be reversed, and a new trial ordered, with costs to the appellant to abide the event.

Judgment and order reversed, and new trial ordered, with costs to appellant to abide event.

CONLAN and O'DWYER, JJ., concur in the result. The negligence complained of, if it existed, was that of a co-workman, for which the master is not liable.